USDC SDNY_____
DOCUMENT_____
ELECTRONICALLY
FILED ____10/3/12____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

GEORGE MIMS,                                          :

                              Petitioner,            :        **REPORT AND**
                                                              **RECOMMENDATION**
             - against -                             :        **TO THE HONORABLE**
                                                              **BARBARA S. JONES**
JAMES J. WALSH,                                      :
                                                              04 Civ. 6133 (BSJ) (FM)
                              Respondent.            :

----------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

I.      Introduction

        In this proceeding, pro se petitioner George Mims ("Mims") seeks habeas

relief following his conviction on two counts of Robbery in the First Degree and three

counts of Robbery in the Second Degree after a jury trial in Supreme Court, Bronx

County.  The charges against Mims arose out of two separate robberies in the same

apartment building on the same day.  On April 6, 1998, Justice Joseph Fisch, before

whom the case was tried, sentenced Mims to consecutive determinate twenty-year

sentences on the first degree robbery counts, to be served concurrently with concurrent

twelve-year sentences on the second degree robbery counts.

        In his amended petition ("Amended Petition" or "Am. Pet.") (ECF No. 18),

Mims advances several claims.  First, Mims contends that the trial court violated his due

process right to a fair trial by allowing testimony by three witnesses who failed to identify

him, improperly questioning a witness to bolster the People's case, and allowing the

arresting officers to testify about certain witnesses' pretrial identifications of him.  (Am. Pet. ¶ 13).  Second, Mims claims that he received ineffective assistance of counsel because his attorney failed to advise him of a plea offer that would have resulted in a ten-year sentence or investigate potential misconduct in connection with pretrial identification procedures during which two trial witnesses identified him.  (Id.).  Finally, Mims challenges the severity of his sentence and claims he was sentenced improperly as a second violent felony offender.  (Id.).

For the reasons that follow, I recommend that the Amended Petition be denied.  Additionally, because Mims has failed to make the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not be issued.

II.    Factual Background

A.    Trial

1.    People's Case

The People's proof at trial would have enabled a reasonable juror to conclude as follows:

On Saturday, February 15, 1997, at approximately 7:30 p.m., Joel Ortiz ("Ortiz") entered 645 Westchester Avenue in the Bronx and stepped into the elevator with three other people, one of whom was Mims.  (Tr. 18-21).[1]  One of the elevator occupants,

---

[1]    "S." refers to the minutes of Mims' sentencing.  "Tr." refers to the trial transcript.  "Ex." refers to the exhibits annexed to the Respondent's Appendices, which are attached to the

(continued...)

a woman, exited on the second floor, at which point Ortiz and two men remained.  As the three continued their elevator ride, Mims displayed a gun and demanded money from Ortiz, who gave him $25.  (Id. at 19).  After determining that Ortiz had nothing else of value, Mims and his accomplice exited the elevator.  (Id. at 20).

Minutes later, Mims and the other man returned to the ground floor via a staircase and appeared to be exiting the building as Jasmine Davis and her cousin Elsa Moure, Edelma Perez and her sister Lorraine Lawrence, and Mildred Concepcion, her ex-boyfriend Raynez Tirado, and their three year-old daughter were entering.  (Id. at 51, 86-87, 100-01).  Mims and his accomplice entered the lobby with the others.  While they waited for the elevator, Mims drew his weapon again and directed everyone to raise their hands.  (Id. at 51-52, 76, 105).

The two robbers then began taking jewelry from the women and searching their handbags.  (Id. at 52).  Mims searched Lawrence's handbag while the other robber took jewelry from Davis and Moure.  (Id. at 52, 107).  Mims then forcibly grabbed a necklace from Perez's neck and took two gold rings from her.  (Id. at 77, 89, 91).  He also demanded money from Davis and Lawrence.  (Id. at 52, 89).  Next Mims pointed the gun at Concepcion's young daughter and demanded that Concepcion give him her necklace and any money she had.  (Id. at 77, 90, 102, 105).  The robbers also took jewelry from Moure.  (Id. at 78).

_____

[1](...continued)
Affidavit of Assistant District Attorney Jonathan Zucker ("Zucker Affidavit" or "Zucker Aff.") (ECF No. 7) in opposition to the Petitioner's original application for a writ of habeas corpus, and the Declaration of Assistant District Attorney Jean Soo Park ("Park Decl.") (ECF No. 25) in opposition to the Petitioner's Amended Petition.

When the elevator arrived, the victims hurried into it in an effort to escape. (Id. at 52, 59, 103-04).  Mims held the door open momentarily, but then allowed it to close, at which point the victims rode upstairs.  (Id.).  Concepcion, whose young daughter had been endangered, testified that after she stepped into the elevator, Mims "just kept staring at my face and I kept staring back at him."  (Id. at 104).

After the robberies, Ortiz identified Mims' photo from among hundreds of suspects' photographs shown to him by the police.  (Id. at 39-40, 138-39).  Subsequently, Ortiz identified Mims during a police lineup.  (Id. at 31).  At trial, Ortiz admitted he had some doubt as to whether Mims was the robber when he saw his picture, and that when he saw the lineup he "wasn't a hundred percent sure, but . . . was almost sure" that Mims was one of the individuals who committed the robbery.  (Id. at 43-44).

Concepcion also selected Mims' photograph from among hundreds in police photo books and later identified him during a lineup.  She selected Mims' photograph on February 18, 1997, just days after the robbery.  (Id. at 128, 146).  She identified Mims during a lineup on March 2, 1997, (id. at 110-11, 140), and at trial.  (Id. at 104).

Jasmine Davis was unable to identify Mims as one of the robbers at trial or during an earlier lineup.  (Id. at 53, 73).  She did, however, describe the robbers as black men who were between 5' 10" and 6' tall.  (Id. at 58).  Mims is 5' 11" tall.  (Id. at 142).

4

Finally, while trying to establish that Perez was unable to make a lineup identification, defense counsel elicited testimony from Detective Robert Grant that Perez had said that the robber "look[ed] just like" Mims, but "didn't want to pick out the wrong person" and, ultimately, chose not to make an identification.  (Id. at 149-50).

Ortiz, Davis, Moure, Perez, and Concepcion each testified at trial.  The People pursued robbery charges only for these five victims.

    2.   <u>Defense Case</u>

Mims presented an alibi defense, supported by his own testimony and that of three witnesses.  Mims first called his fourteen-year-old sister, Amanda Dupont, who testified that she spent the weekend of the robberies at Mims' house and never saw him leave the house during that time.  (Tr. 164-65).  She explained that she came to Mims' home to look after his children so that he and his wife Danielle could go out for Valentines' Day.  (Id. at 162-63).  Although Mims and Danielle decided to stay home, Amanda remained at their house for the weekend.  (Id. at 164).  According to Amanda, on the day of the robberies Danielle went to have her hair done, but Mims never left their home.  (Id. at 164-65).

Mims' wife Danielle testified that on the date of the robberies she and her husband spent the evening at home, although they previously had planned to go to a club to celebrate her first paycheck from a new job.  (Id. at 184-86).  Danielle claimed that she went to have her hair and nails done that afternoon, but returned to their apartment by 5 or 6 p.m.  (Id. at 185).  Later that evening, while she was napping, a friend and neighbor,

Doreen Kofield, knocked on the door because she planned to join Danielle's and Mims' celebration that evening.  (Id. at 189).  Danielle did not speak with Kofield, but knew she visited their home because Mims and Amanda told her Kofield had been there.  (Id.).

Mims also testified that Amanda spent the weekend at his and Danielle's home.  (Id. at 214).  He claimed that they originally planned to go out on Friday night, but were too tired and decided to stay home and go out the following night.  (Id.).  The next day, Mims stayed at the house all day while Danielle went to the beauty parlor.  (Id. at 215).  After Danielle returned home, he went to take a nap with her and instructed Amanda to wake him if anyone came to the door.  (Id.).  At some point that evening, Kofield came to the door and he spoke with her.  (Id. at 219).  Although Danielle claimed that Kofield was supposed to go out with them that evening, Mims testified that they expected her to babysit.  (Id.).  Mims told Kofield that they were too tired to go out.  (Id.).

Finally, Kofield testified that, although she occasionally babysat for the Mims' children, on the evening of February 15, she and her fiancé planned to go out to dinner with Danielle and Mims to celebrate Danielle's new job.  (Id. at 255).  Kofield stated that around 7:20 p.m. she walked to the Mims' door to see if they were ready to go to dinner.  (Id.).  Mims came to the door and told Kofield that he did not know whether he and Danielle would be able to go because Danielle was asleep.  (Id.).  Kofield recalled that even though she did not enter the apartment, she could see that Mims was wearing a bathrobe and that his younger sister and his children were also present.  (Id. at 256).

B.    <u>Verdict and Sentencing</u>

On March 10, 1998, the jury convicted Mims of two counts of Robbery in the First Degree, for the robberies of Ortiz and Concepcion, and three counts of Robbery in the Second Degree, for the robberies of Davis, Moure, and Perez.  (Tr. 331-39, 361-62).  Thereafter, on April 6, 1998, Justice Fisch sentenced Mims, as a second violent felony offender, to consecutive determinate sentences of twenty years on the first degree robbery counts, to be served concurrently with determinate twelve-year sentences on the second degree robbery counts.  (S. 4-5, 19-20).  Mims chose to represent himself at his sentencing, even though Justice Fisch warned him of the potential adverse consequences.  (<u>Id.</u> at 5-6).

C.    <u>Subsequent Procedural History</u>

1.    <u>Direct Appeal and First Motion to Vacate Conviction</u>

On April 22, 1998, Mims filed a timely notice of appeal to the Appellate Division, First Department.  (Zucker Aff. ¶ 9).  Subsequently, while his appeal was pending, Mims moved, <u>pro se</u>, to vacate his judgment of conviction pursuant to Section 440.10 of the New York Criminal Procedure Law ("CPL"), on the grounds that the prosecutor improperly failed to furnish him with <u>Brady</u> material prior to trial,[2] and that he received ineffective assistance of trial counsel.  (<u>Id.</u> Ex. 4).

---

[2]    See <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

On March 24, 2000, Justice Fisch denied Mims' pro se motion because "sufficient facts appear[ed] on the record to permit adequate review of the claim[s] upon [Mims' direct] appeal."  (Id. Ex. 6 at 2-3 (citing CPL §§ 440.10(2)(b), 440.30(4)(b), (d))).  Justice Fisch further concluded that Mims failed to support his assertions with sufficient sworn allegations of fact, as required by CPL § 440.30.  (Id. at 3).

On April 25, 2000, Mims moved, pro se, for leave to appeal the denial of his Section 440.10 motion, also asking that this appeal be consolidated with his direct appeal to the Appellate Division.  (Zucker Aff. ¶ 14).  Mims' counsel subsequently filed a brief with the Appellate Division on his behalf on May 4, 2000.  (Zucker Aff. Ex. 7).  In that brief, Mims' counsel claimed that:  (a) his guilt was not proven beyond a reasonable doubt and his conviction was against the weight of the evidence; (b) the trial court violated Mims' due process rights by failing to charge the jury with respect to Mims' alibi defense; and (c) the trial court violated Mims' Sixth Amendment right to counsel by failing to inform him adequately about the dangers of proceeding pro se at his sentencing.  (Id.).

On June 6, 2000, Justice Israel Rubin of the Appellate Division granted Mims' motion to consolidate his appeals.  (Zucker Aff. ¶ 16).  Thereafter, Mims' counsel filed an additional brief advancing the claims in Mims' Section 440.10 motion.  (Id. Ex. 9).  On February 1, 2001, the Appellate Division unanimously affirmed the judgment of conviction and the denial of Mims' motion.  People v. Mims, 719 N.Y.S.2d. 576 (1st Dep't 2001).  With respect to the direct appeal, the Appellate Division concluded that

"the verdict was based on legally sufficient evidence and was not against the weight of the evidence," and that the trial court "properly permitted [Mims] to waive his right to counsel and to appear pro se at sentencing." People v. Mims, 280 A.D.2d 262.  The Appellate Division further determined that Mims' challenge to the jury charge was "unpreserved" and "declin[ed] to review it in the interest of justice." Id. at 263.  The court nevertheless observed that, were it to "review this claim, [it] would find no basis for reversal." Id.  Finally, the Appellate Division stated that the trial court's denial of Mims' Section 440.10 motion was "correct." Id.

On March 5, 2001, Mims filed an application for leave to appeal to the Court of Appeals, (Zucker Aff. ¶ 19), which application was denied on May 21, 2001. People v. Mims, 96 N.Y.2d 832 (2001).

### 2.   Additional Applications for Collateral Review

On January 30, 2002, Mims filed a second Section 440.10 motion, alleging ineffective assistance of counsel.  (Zucker Aff. Ex. 10).  Specifically, Mims alleged that his trial counsel failed to seek a favorable plea bargain and had not counseled him properly with respect to a plea bargain for a ten-year sentence that allegedly was offered just before the jury returned its verdict.  (Id.).  In a decision dated May 29, 2002, Justice Fisch deemed Mims' motion to be a motion to reargue his earlier Section 440.10 motion, and denied it summarily.  (Id. Ex. 12).  Apparently, Mims then moved for leave to appeal Justice Fisch's decision.  (Zucker Aff. ¶ 23).  Justice Alfred D. Lerner of the Appellate Division denied Mims' application on August 20, 2002.  (Id.).

9

On August 12, 2002, Mims filed yet another motion for post-conviction relief, this time challenging his sentence under CPL § 440.20.  (Zucker Aff. Ex. 13).  In his papers, Mims argued that the consecutive sentences imposed by Justice Fisch on the first degree robbery counts should have run concurrently because they constituted a single criminal transaction.  (Id.).  Justice Fisch denied that motion on November 22, 2002, concluding that Mims had "committed separate, distinct, successive acts against separate victims."  (Id. Ex. 15).  The Appellate Division denied Mims' application for leave to appeal that ruling on April 2, 2003.  (Id. ¶ 27).

On June 10, 2003, Mims filed a pro se application for a writ of error coram nobis in the Appellate Division, challenging the effectiveness of both his trial and appellate counsel.[3]  (Id. Ex. 16).  In that motion, Mims contended that his trial counsel was ineffective for failing to renew (or press for a decision on) his claim that two of his potential alibi witnesses had been intimidated by Notices to Appear and Produce, which had been served on them by the Office of the Bronx District Attorney.  (Id.).  Mims also argued that his trial counsel was ineffective because he failed to argue that the verdict was repugnant.  (Id.).  Finally, Mims claimed that his appellate counsel were ineffective because they failed to raise the prosecutorial intimidation and verdict repugnancy claims and also failed to advance a Brady claim based on a detective's statement to one of the victims who identified Mims in a lineup.  (Id.).  In that statement, the detective allegedly

---

[3]     Mims was represented on appeal by the Center for Appellate Litigation.  (Zucker Aff. Ex. 7).

advised the victim that Mims was on parole following his conviction on a prior robbery charge.  (Id.).

The Appellate Division summarily denied Mims' coram nobis petition application on January 22, 2004.  (Id. Ex. 18).  On February 19, 2004, Mims sought leave to appeal this decision; the Court of Appeals denied that request on May 14, 2004.  (Id. ¶ 31).

3.     Habeas Petition and Subsequent Collateral Challenges

Mims' original habeas petition ("Petition" or "Pet.") is dated May 25, 2004, and was received by the Court's Pro Se Office on July 14, 2004.  (ECF No. 1).  In that Petition, Mims advanced each of the issues raised as part of his direct appeal and subsequent collateral applications.  (Pet. Attach. at 3-4).

After filing the Petition – and after the Respondent had filed his opposition papers – Mims filed two further Section 440.20 motions.  In the first such motion, which was dated January 31, and amended on February 24, 2006, Mims claimed that his sentence as a second violent felony offender was improper because one of his prior convictions was a misdemeanor rather than a felony, and that the trial court violated his due process rights by refusing to allow him to contest this inaccuracy before he was sentenced.  (Park Decl. Exs. 1, 2).  In his second Section 440.20 motion, dated June 13, 2006, Mims claimed that the People had failed to prove his guilt beyond a reasonable doubt because several of the victims were unable to identify him at trial.  (Park Decl. Ex. 4).  Significantly, in this filing, Mims retreated from his earlier position concerning his sentence, conceding it was legal but arguing that it was "unduly harsh."  (Id.).

11

Mims interposed a further challenge to his conviction, captioned a "motion of amendment," on June 20, 2006.  In that motion, Mims contended that Justice Fisch prejudiced him by questioning Concepcion himself at the close of counsels' direct and cross-examinations.  (Id. Ex. 6).  During that brief inquiry, the Justice asked about the persons other than Perez who were in the elevator.  (Id.).  Mims contended that this was improper because the other individuals had failed to identify him.  (Id.).  Mims further argued that the trial court improperly allowed Detective Grant to testify about Concepcion's and Ortiz's pretrial lineup identifications of Mims.  (Id.).  In a further amendment to his June 13 and June 20 submissions, dated July 3, 2006, Mims claimed that testimony concerning two witnesses' pretrial identifications of him from a photo array should not have been allowed because their credibility had not been challenged on cross examination.  (Id. Ex. 7).

In a Decision and Order dated October 24, 2006, Justice Fisch denied each of these numerous applications.  (Park Decl. Ex. 8).  Turning first to Mims' sentence, Justice Fisch held, inter alia, that a trial court "may not alter a previously imposed sentence in the interest of justice" and that any challenge to the severity of his sentence therefore should have been raised with the Appellate Division on direct appeal.  (Id. at 6).

Next, Justice Fisch held that Mims' challenge to the sufficiency of the evidence was procedurally barred because that claim had been raised and rejected as part of his direct appeal.  (Id. at 7 (citing CPL § 440.10(2)(a))).

Finally, Justice Fisch rejected Mims' claims concerning his opportunity to challenge inaccuracies in the presentence report, noting that Mims was given a copy of

the report on April 3, 1998, and that his sentencing then was adjourned until April 6, 1998.  (Id. at 9).  Justice Fisch concluded that Mims therefore had more than the required twenty-four hour period to review the report.  He also observed that Mims was permitted to speak during his sentencing but did not challenge any statements in the presentence report at that time.  (Id. at 9).  For this reason, Justice Fisch held that Mims had "waived any claim regarding the accuracy of the presentence report."  (Id. at 9).

On November 19, 2006, Mims sought leave to appeal Justice Fisch's decision.  (Park Decl. Ex. 9).  The Appellate Division denied that application on April 10, 2007.  (Park Decl. ¶ 8).

On December 5, 2006, Mims interposed a fifth motion to vacate his conviction under Section 440.10, claiming that his trial counsel, Frank Bari, Esq., provided ineffective assistance by failing to provide advice to him regarding a proposed plea bargain.  (Park Decl. Ex. 10).  Mims claimed that an affidavit by Mr. Bari that the respondent had included in his papers opposing Mims' original habeas petition provided new information that had not been available to him when he filed his first Section 440.10 motion claiming ineffective assistance.  (Id.).  In that affidavit, Mr. Bari explained that Mims had been offered a ten-year sentence in exchange for pleading guilty to all the charges but that he had "laughed at the court" and rejected the offer.  (Id.).  The People opposed the motion, but not Mims' request for an evidentiary hearing.  (Park Decl. Ex. 11).  Accordingly, Justice Fisch held an evidentiary hearing on September 18 and November 1, 2007.  (Park Decl. ¶ 11).

Following the hearing, Justice Fisch concluded, in a Decision and Order dated May 12, 2008, that a plea offer of ten years had been made during the trial, that Mims chose not to avail himself of this offer, and that Mr. Bari adequately counseled Mims regarding this and other offers that were made.  (Id. Ex. 16).  Mims sought leave to appeal this determination to the Appellate Division, which request was denied on July 16, 2008.  (Id. ¶ 14).

While Mims' fifth Section 440.10 motion was pending, he filed yet another Section 440.10 motion, claiming that Mr. Bari's affidavit also constituted new evidence related to the claim in his first Section 440.10 motion that Mr. Bari failed to investigate the case properly because he did not interview Concepcion prior to trial.  (Park Decl. Ex. 17).  Included in his papers was an affidavit dated June 9, 1999, in which Concepcion stated that one of the police detectives had informed her – incorrectly – that Mims was "on parole" on a robbery charge.  (Id.).  Concepcion also averred that she recently had been shown a photograph of Mims' brother, who "could" have been the person who robbed her.  (Id.).  Mims did not explain his failure to produce this affidavit in any of his prior applications for collateral relief.

On October 10, 2008, Mims filed an "amending motion," further asserting that Mr. Bari had failed to investigate the allegedly improper identification procedures that Detective Grant had used to secure Ortiz's pretrial identification.  (Id. Ex. 18).

On January 28, 2009, Mims filed his final substantive state court motion, in which he challenged his sentence under CPL § 440.20.  (Id. Ex. 21).  Mims claimed that he was improperly sentenced as a second violent felony offender, this time because his

14

earlier violent felony conviction, which resulted from a guilty plea, was entered

unlawfully.  (Id.).  By then, Justice Fisch had left the bench to become the Inspector

General of New York State.  By Decision and Order dated April 29, 2009, his successor,

Justice Megan Tallmer, denied all three remaining motions that Mims had filed.  (Id. Ex.

22).  Justice Tallmer rejected Mims' claims concerning the failure to interview

Concepcion and Ortiz because Mr. Bari's affidavit demonstrated that his actions

constituted "a legitimate defense strategy."  (Id. at 10).  Specifically, she found that Mr.

Bari reasonably chose not to question Concepcion about the possibility that the armed

robber might have been Mims' brother because he had met the brother and concluded that

his appearance was dissimilar.  (Id. at 9).  Moreover, Mr. Bari reasonably concluded that

the jury still might find that Mims was the second, as yet unidentified, assailant.  Worse

yet, evidence of his brother's involvement could have implicated Mims in additional

robberies in which Mims' brother allegedly had acted in concert with another individual.

(Id. at 9-10).  Justice Tallmer further stated that even if Mims had shown that Mr. Bari

should have investigated these issues, he could not establish that he was prejudiced at

trial, because Mr. Bari proved to be "a skillful and thorough advocate."  (Id. at 10).[4]

Turning to Mims' second felony offender challenge, Justice Tallmer noted

that Mims claimed that his earlier conviction for Criminal Possession of a Weapon in the

Third Degree was unlawful because CPL § 220.10(4)(b) required that he be permitted to

---

[4]     Although Justice Tallmer did not make specific findings concerning the other
identifications, she noted that Mr. Bari "did not believe it would be beneficial to his client to
argue that Mr. Ortiz's lineup identification occurred shortly after Mr. Ortiz picked [Mims']
picture out of an array of several hundred people."  (Id. at 6).

plead guilty only to the lesser included offenses of Attempted Criminal Possession of a
Weapon in the Third Degree or Criminal Possession of a Weapon in the Fourth Degree.
(Id. at 11).  As Justice Tallmer observed, that statute requires that the People consent to
any plea of guilty to a lesser included offense.  CPL § 220.10(2) provides, however, that a
criminal defendant may plead guilty to the entire indictment.  (Id. at 11).  Justice Tallmer
held that Mims' earlier conviction therefore was lawful.

Mims sought leave to appeal to the Appellate Division, which denied that
request on August 6, 2009.  (Park Decl. ¶ 19).

On September 3, 2009, given the volume of his state court filings, I directed
that Mims file an amended petition identifying the claims he wished to pursue in federal
court.  (ECF No. 17).  Mims then timely filed his Amended Petition on October 2, 2009.
(ECF No. 18).  In the Amended Petition, Mims abandons several of the claims in his
original petition and adds several others.  Mims' habeas claims are as follows:

    a.    The trial court violated his due process rights by:

        1.    allowing the testimony of three witnesses who failed to
                identify him as a perpetrator;

        2.    allowing the jury to convict him of Robbery in the First
                Degree without the People having proven all of the
                required elements;

        3.    leading a witness to bolster the prosecution's case; and

        4.    allowing the police officers and victims to testify about
                pretrial identification procedures.

    b.    He was deprived of effective assistance of counsel because
        trial counsel:

1.    failed to expose Detective Grant's misleading statements to Concepcion concerning Mims' criminal record;

2.    failed to expose the suggestiveness of Ortiz's pretrial identification; and

3.    failed to inform and counsel him about the People's ten-year plea offer.

c.    He was sentenced unlawfully because:

1.    his earlier conviction was improper and therefore did not support his sentence as a second violent felony offender; and

2.    his forty-year sentence was unduly harsh when compared to the ten-year sentence he was offered as part of a plea agreement during trial.

Over time, the Respondent has made two submissions in opposition to Mims' claims. First, on February 18, 2005, the Respondent filed the Zucker Affidavit and an accompanying Memorandum of Law, (ECF No. 7), responding to the original petition. Second, on March 30, 2010, the Respondent filed the Park Declaration and an accompanying Memorandum of Law, (ECF No. 25), responding to the Amended Petition.

III.   <u>Discussion</u>

A.   <u>Standard of Review</u>

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court. <u>Herrera v. Collins</u>, 506 U.S. 390, 401 (1993). Rather, a state prisoner seeking habeas relief must show that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The

17

petitioner bears the burden of proving, by a preponderance of the evidence, that his rights have been violated.  See Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides in part that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit noted in Jones v. Stinson, the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'"  Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Id. (citing Williams v. Taylor, 529 U.S. 362, 412-13 (2000)).  Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  This standard does not require that reasonable jurists would all agree that the state court was wrong.  Id. at 409-10.  Rather, the standard

"falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Stinson, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

Section 2254(d)(2) further authorizes the federal courts to grant a petition for a writ of habeas corpus when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Finally, to the extent that a habeas petition challenges factual findings, section 2254(e)(1) provides that "a determination of a factual issue by a State court shall be presumed to be correct" and that "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail."  Williams, 529 U.S. at 389.

B.    Merits

1.    Due Process Claims

a.    Weight and Sufficiency of the Evidence

Mims claims that the evidence was insufficient to convict him on the charge of Robbery in the First Degree.  (Am. Pet. ¶ 13(B)).  To the extent that Mims claims his conviction was contrary to the weight of the evidence, his claim clearly is not cognizable on federal habeas review.  See Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996); Givens v. Burge, No. 02 Civ. 0842 (JSR) (GWG), 2003 WL 1563775, at *10 (S.D.N.Y. Mar. 4, 2003) (Report & Recommendation) (collecting cases).  On the other hand, the

19

sufficiency of the evidence used to convict a defendant is an issue that a habeas court may address.  Jackson v. Virginia, 443 U.S. 307, 318 (1979).  A habeas petitioner challenging the sufficiency of the evidence nevertheless bears a "very heavy burden."  Knapp v. Leonardo, 46 F.3d 170, 178 (2d Cir. 1995) (internal quotation marks omitted).  To prevail, the petitioner must show that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  Bossett v. Walker, 41 F.3d 825, 830 (2d Cir. 1994) (quoting Jackson, 443 U.S. at 324).  In considering such a sufficiency claim, a habeas court must weigh the evidence in the light most favorable to the prosecution and draw all permissible inferences in its favor.  Jackson at 326.

A sufficiency claim therefore does not permit the reviewing court to redetermine the credibility or reliability of witnesses or substitute its view of the evidence for that of the trier of fact.  See Marshall v. Lonberger, 459 U.S. 422, 434 (1983); Maldonado, 86 F.3d at 35.  Rather, insofar as there is evidence from which the jury could have drawn an inference favorable to the accused but chose not to, the court must "defer to . . . the jury's choice of the competing inferences."  United States v. Kinney, 211 F.3d 13, 18 (2d Cir. 2000) (quoting United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998)).  For this reason, "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction."  United States v. Danzey, 594 F.2d 905, 916 (2d Cir. 1979); see also Edwards v. Jones, 720 F.2d 751, 755 (2d Cir. 1983) (following Danzey even though the testimony and character of the sole witness who directly implicated the petitioner were "less than inspiring"); Means v. Barkley, No. 98 Civ. 7603 (DLC), 2000

WL 5020, at *4 (S.D.N.Y. Jan. 4, 2000) (applying <u>Danzey</u> and noting that habeas court may set aside conviction only if testimony is "incredible as a matter of law").

Mims claims that the People failed to prove him guilty of Robbery in the First Degree beyond a reasonable doubt because they did not introduce evidence that he used "an operable or deadly or dangerous instrument" during the commission of the Ortiz and Concepcion robberies.  (Am. Pet. ¶ 13(B)).   Under New York law, an individual is guilty of Robbery in the First Degree when he, "forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . [d]isplays <u>what</u> <u>appears</u> <u>to</u> <u>be</u> a pistol, revolver, rifle, shotgun, machine gun or other firearm."  N.Y. Penal Law ("PL") § 160.15 (emphasis added). Under a plain reading of the statute, therefore, the People were not required to prove that the gun Mims displayed was operable.

At trial, several witnesses testified that Mims displayed a gun during the robberies.  Ortiz testified that Mims pointed a "black gun" at him while they were inside the elevator.  (Tr. 19, 24).  Concepcion similarly testified that Mims was the gunman.  (<u>Id.</u> at 104).  All the other victims of the second robbery who testified confirmed that one of the robbers had a gun.   (<u>Id.</u> at 52, 57, 63-64, 72-73, 76, 80, 88).  This testimony was more than sufficient for a reasonable juror to find that the People had established this element of first degree robbery.[5]

---

[5]       The statute does afford a defendant an affirmative defense, pursuant to which he may introduce evidence that the firearm displayed was not "a loaded weapon from which a shot, readily capable of producing death or other serious physical injury, could be discharged."  PL § 160.15.  Mims did not introduce any such evidence.

Mims also contends that the evidence concerning the three counts of second degree robbery was insufficient because the victims of those crimes failed to identify him. (Am. Pet. ¶ 13(A)).  At trial, Concepcion unequivocally identified Mims as one of the two people who committed the robbery in the lobby of 645 Westchester Avenue.  (Tr. 104). Although Davis, Moure, and Perez were unable to identify Mims as the robber two years after the crime occurred, they corroborated Concepcion's account of the incident in numerous other details.  A reasonable juror therefore could have concluded that Mims was one of the individuals who robbed Davis, Moure and Perez.  There consequently is no basis for this claim.

b.    <u>Evidentiary Claims</u>

In his Amended Petition, Mims challenges several of the trial judge's evidentiary rulings related to the victims' identifications of him before and during his trial.  Specifically, Mims claims that the trial court violated his due process rights by allowing Davis, Moure and Perez to testify, and therefore "bolster" the prosecution's case, even though they failed to identify him as one of the robbers.  (Am. Pet. ¶ 13(A)). Mims further contends that the trial court improperly allowed Detective Grant to testify about the pretrial identifications made by Ortiz and Concepcion.  (Am. Pet. ¶ 13(E)).

The suggestion that it somehow was improper for the People to call victims who were robbed at the same time as Concepcion but who were unable to identify him is absurd.  By testifying that Mims was the gunman during the lobby incident, Concepcion, in effect, gave testimony that also incriminated Mims with respect to the charges relating to the other three victims.  To be guilty of first or second degree robbery, however, a

22

defendant must have stolen property from its owner.  <u>See</u>, <u>e.g.</u>, PL §§ 160.00 (defining

robbery as forcible stealing of property during the course of committing a larceny),

155.05 ("A person steals property and commits larceny when . . . he wrongfully takes,

obtains or withholds such property <u>from an owner thereof</u>.") (emphasis added).  If

nothing else, it therefore would have been essential for the People to call the other three

victims to establish that they were the owners of the jewelry and other property taken

from them.

        Turning to Mims' other bolstering claim, under New York law it generally

is impermissible for one witness to confirm an identification previously made by <u>another</u>

witness.  <u>See</u> <u>Snow v. Reid</u>, 619 F. Supp. 579, 582 (S.D.N.Y. 1985) ("The concept of

'bolstering' . . . [is] derived from <u>People v. Trowbridge</u>, 305 N.Y. 471 (1953), which

holds that it is error to permit an identification made by one witness to be corroborated by

the testimony of another witness who merely testifies that the identification did occur.").

Here, during their testimony, Ortiz and Concepcion each identified Mims as one of the

robbers in the courtroom and then testified, in substance, that they also had identified him

during a lineup.  (Tr. 21, 31, 43-44, 104, 110-11).  Since this did not involve the

testimony of another witness, such as a police officer, it was entirely permissible under

New York law.

        To be sure, Detective Grant was permitted to testify at trial about the pre-

lineup identifications that Ortiz and Concepcion made from the photograph arrays.  (<u>Id.</u> at

135-42, 146-48).  Before he did so, however, Mims' counsel had cross-examined both

witnesses in a manner that questioned the accuracy of their identifications.  (<u>Id.</u> at 39-43,

23

117-27).   Indeed, it was Mims' counsel himself who first questioned the witnesses about the photo arrays, apparently hoping to show that their lineup identifications were based upon the photographs they were shown, rather than the underlying incidents, and that they may have selected the wrong person from the photographs.  (Id. at 39-40, 117-20).  Under New York law, it generally is improper to admit testimony from a complaining witness that she identified the defendant from a photograph.  People v. Giallombardo, 128 A.D.2d 547, 548 (2d Dep't 1987) (citing cases).  However, an "exception to this rule arises where the defendant opens the door to this inquiry during his cross-examination of the witness." Id.  Here, although the testimony came in through Detective Grant, who was not the complaining witness, the fact remains that defense counsel opened the door.

          In any event, even if Detective Grant's testimony somehow violated New York case law, it usually is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions," Estelle v. McGuire, 502 U.S. 62, 67-68 (1991), because, "[g]enerally, rulings by state trial courts on evidentiary issues, even if erroneous, do not rise to the level of a constitutional violation."  Copes v. Schriver, No. 97 Civ. 2284 (JGK), 1997 WL 659096, at *3 (S.D.N.Y. Oct. 22, 1997);  accord Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988); Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983); Roberts v. Scully, 875 F. Supp. 182, 189 (S.D.N.Y. 1995), aff'd 71 F.3d 406 (2d Cir. 1995).  Mims consequently must show that any alleged evidentiary error at trial was "of constitutional dimension" and deprived him of "fundamental fairness."  Rosario, 839 F.2d at 924 (2d Cir. 1988); see also McCray v. Artuz, No. 93 Civ. 5757 (LBS), 1994 WL 603057, at *2 (S.D.N.Y. Nov. 3, 1994) (habeas relief warranted only where petitioner

demonstrates that the state evidentiary error was of "constitutional magnitude").  For an evidentiary error to rise to this level, it must have had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  Stated somewhat differently, the evidence "must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (quoting Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992)).

Here, both Ortiz and Concepcion testified at trial that Mims was the person who robbed them at gunpoint.  In light of this unequivocal testimony, Mims cannot show that Detective Grant's testimony was so prejudicial as to warrant a new trial.

c.    Judicial Interference

Mims further contends that Justice Fisch violated his due process rights by improperly eliciting additional details from Concepcion about the other victims of the robbery.  (Am. Pet. ¶ 13(D)).  "[A] trial is not rendered unconstitutionally unfair every time a trial judge asks a question[.]" Daye v. Att'y Gen. of N.Y., 712 F.2d 1566, 1572 (2d Cir. 1983).  Rather, a "trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits." Id.

Here, Mims' claim rests on a single brief exchange between Justice Fisch and a witness.  (Park Decl. Ex. 6 at 2-3).  After Mims' counsel finished his re-cross examination of Concepcion, Justice Fisch asked her the following questions:

> THE COURT:     Before you leave Ms. Concepcion, I have a question or two.  Besides the name of Miss Perez, who you said was one of the people in the elevator with you that was robbed, do you know the names of the other people in the elevator, any of them?
>
> THE WITNESS:   No.
>
> THE COURT:     Can you describe them?
>
> THE WITNESS:   There were two young girls, I think like high school age.  There was Miss Perez which is an older lady with her sister, an older lady.  There was myself, my ex-boyfriend, my daughter, and the two guys who came in to rob us.
>
> THE COURT:     And you said that the girls who were robbed were teenagers?
>
> THE WITNESS:   Yeah, I guess.  I'm guessing like about 16, 17, maybe like that age.

(Tr. 129-30).

Mims claims that this exchange prejudiced him because it highlighted the presence of Davis, Moure, and Perez, each of whom was unable to identify him at trial. (Park Decl. Ex. 6 at 4).  He concedes, however, that the questioning was cumulative. Moreover, through his wholly innocuous questions, Justice Fisch did not demonstrate a bias for or against either side.  Indeed, even if he had exhibited such a bias, in his charge the Justice instructed the jurors:

26

> You are not to consider anything I said during the trial or any
> questions I ask or any rulings I made or anything that I may
> say to you during the course of this charge as indicating that I
> hold an opinion on this case one way or the other.

(Tr. 315).  Accordingly, even if Justice Fisch's questioning of Concepcion constituted

improper comment, it cannot provide a basis to set aside Mims' conviction because the

jury must be presumed to have followed his instruction to disregard it during their

deliberations.  See, e.g., United States v. Downing, 297 F.3d 52, 59 (2d Cir. 2002);

United States v. Colombo, 909 F.2d 711, 715 (2d Cir. 1990); United States v.

Pforzheimer, 826 F.2d 200, 205 (2d Cir. 1987).

### 2.   Ineffective Assistance of Counsel

Mims further claims his trial counsel was ineffective because he failed to

investigate Concepcion and Ortiz prior to trial, thereby forfeiting his opportunity to

cross-examine them regarding the suggestiveness of their pretrial identifications.  He

also claims that trial counsel was ineffective for failing to advise him of a ten-year plea

offer during the trial.  (Am. Pet. ¶ 13).

In order to prevail on his ineffective assistance of counsel claims, Mims

must demonstrate that (a) his counsel's performance "fell below an objective standard of

reasonableness" and (b) there is a "reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."

Strickland v. Washington, 466 U.S. 668, 688-94 (1984).  Under Strickland, there is a

"strong presumption that [a lawyer's] conduct falls within the wide range of reasonable

professional assistance."  466 U.S. at 689.  Therefore, Mims "must overcome the

presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  As the Second Circuit has noted, "[t]he Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

a.    Failure to Investigate

In Strickland, the Supreme Court addressed an attorney's duty to investigate, stating that:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91.  See also Wiggins v. Smith, 539 U.S. 510, 527 (2003) ("In assessing the reasonableness of an attorney's investigation . . . , a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").  Given the considerable discretion that counsel is afforded, it is clear that the duty to investigate does not "compel defense counsel to investigate comprehensively every lead or possible defense." Greiner v. Wells, 417 F.3d 305, 321 (2d Cir. 2005).

In his sixth Section 440.10 motion, Mims claimed that his counsel should have interviewed Concepcion before trial.  According to Mims, such an interview would

have revealed that a police detective improperly told Concepcion that Mims was on parole in connection with a robbery charge.  (Park Decl. Ex. 17).  This information, Mims argues, would have allowed Mr. Bari to challenge further the suggestiveness of Concepcion's pretrial identifications of Mims.  (Id.).

It is undisputed that Mims' counsel hired an investigator who made an unsuccessful attempt to locate Concepcion prior to trial.  In the absence of any evidence that the investigator's efforts were insufficiently diligent, there is no basis on which this Court could conclude that Mims' counsel's efforts to locate Concepcion were objectively unreasonable.  Moreover, at the trial, Concepcion testified at length about the identification procedures in which she participated.  (Tr. 110-12, 116-23, 124-28).  The mere fact that the police may have provided some background information about Mims (presumably after she picked him out of the photo array) does not suggest that either of her identifications was unreliable.  Mims therefore cannot show that he was prejudiced by the failure to locate Concepcion prior to trial.

Concepcion's post-trial statement that Mims' brother might have been the robber, although admittedly curious, similarly does not entitle Mims to habeas relief.  As Mr. Bari explained in an affirmation prepared after Mims filed his original habeas petition, he had met Mims' brother and concluded that they did "not bear a close resemblance to each other."  (Park Decl. Ex. 19 Attach. (Affirm. of Frank Bari, Esq., dated Dec. 6, 2008 ("Bari Aff.")), ¶12).  Moreover, as Justice Tallmer found, Mr. Bari learned that Mims' brother himself was a suspect in several robberies that were close in time.  (Park Decl. Ex. 22 at 9; Bari Aff. ¶ 12).  Mims also had instructed his counsel to

keep his brother "out of the case." (Bari Aff. ¶ 16).  In these circumstances, as Justice

Tallmer correctly observed, there is no reason to second guess counsel's judgment that

introducing evidence about the brother could cause the jury to conclude that he was the

other, unidentified male who participated in the robberies.  (Park Decl. Ex. 22 at 10).

Mims also claims that had Mr. Bari interviewed Ortiz prior to trial, he

would have learned that Detective Grant showed Ortiz a photo array "just 2 ½ hours"

before Ortiz viewed the lineup in which Mims participated.  (Id. Ex. 18 ¶ 6).  Mims

evidently bases this assertion on the People's Voluntary Disclosure Form ("VDF"),

which indicates that someone made an identification from a photo array on March 1,

1997, at 5:30 p.m., shortly before another identification was made from a lineup at 8

p.m.  (Id. (Attach.)).  Tellingly, however, the VDF does not suggest that Ortiz was the

person who made the photo identification on that date.  Indeed, Ortiz testified that he

viewed photographs approximately "a week or two" after the incident.  (Tr. 47).

Although Ortiz also testified that the police "just showed me photos before I went to the

line-up," (Id. at 48), that is not the same as testifying that he was shown photographs

"just before" the lineup.  In fact, Ortiz expressly refuted that suggestion, testifying that

he went to the police station "once before" the lineup on March 1.  (Id.) (emphasis

added).

In any event, even if Ortiz was shown a second photo array shortly before

the lineup, that scarcely suggests that any of the identification techniques used by the

police in the course of their investigation was unduly suggestive.  Indeed, since two

eyewitnesses placed Mims at the scene of the crime, Mims plainly cannot show that

there was a "reasonable probability" that he would have been acquitted had his counsel been able to cast some further doubt on Ortiz's identification of him. He therefore is not entitled to habeas relief based on his counsel's alleged failure to conduct an adequate pretrial investigation of Ortiz.

        b.       <u>Failure to Advise of a Plea Offer</u>

In companion cases last term, the Supreme Court held that "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused," <u>Missouri v. Frye</u>, 132 S. Ct. 1399, 1408 (2012), and that a petitioner is prejudiced if he receives ineffective advice that causes him to reject such a plea offer that he otherwise would have accepted, <u>Lafler v. Cooper</u>, 132 S. Ct. 1376, 1391 (2012). <u>See also</u> <u>Boria v. Keane</u>, 99 F.3d 492, 496 (2d Cir. 1996) (observing that defense counsel's "duty to advise his client fully on whether a particular plea to a charge appears to be desirable" is "so well understood by lawyers practicing in this Circuit that the question has never been litigated"). Here, it appears that Mims advances both claims, asserting that he was unaware of a proposed ten-year deal and that he should have been counseled to plead guilty pursuant to it. (Am. Pet. ¶ 13).

As Justice Fisch observed, Mims, his attorney, and his girlfriend all testified at a hearing that a ten-year plea offer was extended to Mims during the trial. (Park Decl. Ex. 16 at 7-9; H. 48, 52-54, 89-90, 94, 118, 144). They differed, however, as to precisely when the offer was made. (Park Decl. Ex. 16 at 7-8). Mr. Bari recalled that the offer occurred after jury selection but before any testimony and that Mims had

emphatically rejected this offer, saying "I'm not taking any fucking deal."  (H. 54).

Whatever the timing of the ten-year offer may have been, there is no dispute that it was

extended and that Mims was aware of it.

Observing that "what constitutes meaningful representation depends on the

unique facts and circumstances of each case," (Park Decl. Ex. 16 at 10), Justice Fisch

noted that, in his discussion with counsel, Mims was adamant about his innocence and

desire to establish an alibi defense that he was at home when the robberies took place.

(Id. at 10).  In light of Mims' protestations of innocence and the fact that a guilty plea

was "going to put him into a violent area in sentencing," (H. 74), Mr. Bari evidently did

not urge him to plead guilty, although he did inform Mims that he would be "facing a

significant amount of jail time" if he were found guilty.  (Park Decl. Ex. 16 at 10).

Justice Fisch found that this was all that was necessary in these circumstances, and that

Mims consequently could not show that he failed to "take a plea because he had been

inadequately counseled."  (Id. at 11).[6]

To prevail on this branch of his ineffectiveness claim, Mims must show

that Justice Fisch's findings concerning the adequacy of the advice he received

constituted an unreasonable application of law clearly established by the Supreme Court

or an unreasonable determination of the facts in light of the evidence presented during

the state court hearing.  28 U.S.C. § 2254(d)(1), (e)(1).  In his papers, Mims has done

---

[6]     Justice Fisch further found that even if Mims had been counseled to accept the
offer of a ten-year deal, he would have rejected the advice.  (Id.).

neither.  His ineffectiveness claim relating to plea discussions consequently must be rejected.

### 3.   Sentencing Claims

Finally, Mims challenges the propriety of his sentence on two separate grounds.  First, he contends that he should not have been sentenced as a second violent felony offender because his prior conviction for Criminal Possession of a Weapon in the Third Degree was improper under New York Law.  (Am. Pet. ¶ 13).  Second, Mims argues that his sentence was unduly harsh because the trial court sentenced him to a prison term four times greater than the ten-year term he had been offered as part of a plea bargain.  (Am. Pet. ¶ 13(D)).

As Justice Tallmer correctly concluded, Mims misreads the section of the CPL that forms the basis for his claim that he was sentenced improperly as a second violent felony offender.  (Park Decl. Ex. 22 at 11).  Section 220.10, upon which he relies, provides that the only pleas to an indictment that may be entered are those set forth therein.  Although subsection 4(b) of CPL § 220.10 allows a defendant to plead guilty to a lesser included offense, the consent of both the prosecutor and the court is required.  Subsection 2 of the same statute also makes clear that the defendant may "as a matter of right enter a plea of 'guilty' to the entire indictment."  It follows that nothing in the statute required the People or the court to accept a plea to a lesser included felony in satisfaction of the charge of Criminal Possession of a Weapon in the Third Degree.

Mims further contends that his sentence was improper because it was substantially greater than the sentence offered to him as part of a proposed plea bargain.

(Am. Pet. ¶ 13(D)).  No federal constitutional issue is presented, however, when a sentence is within a range prescribed by state law, unless the sentence is so disproportionate to the crime as to violate the ban on cruel and unusual punishment. White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam).  Here, the top counts on which Mims was convicted both charged him with Robbery in the First Degree, which is a Class B felony.  PL § 160.15.  As a second violent felony offender convicted of a Class B felony, Mims had to be sentenced to "at least ten years," but not more than twenty-five years on each count.  PL § 70.04.  The New York Court of Appeals further has held that consecutive sentences may be imposed "where . . . crimes are committed through separate and distinct acts, even though part of a single transaction[.]"  People v. Salcedo, 92 N.Y.2d 1019, 1021 (1998).  Mims consequently could have been sentenced to two consecutive twenty-five year terms, i.e., a total of fifty years.  The forty-year sentence that he actually received was well within the range prescribed by New York law.  Moreover, given the nature of Mims' crimes and his prior record, the forty-year sentence, though harsh, clearly does not violate the Eighth Amendment.

There also is no reason to believe that the trial court enhanced the sentence merely because Mims opted for a trial.  Had Mims pleaded guilty, he would have accepted responsibility for his wrongdoing, which is a recognized basis for imposing a lower sentence.  See, e.g., U.S. Sentencing Guidelines Manual § 3E1.1 (Acceptance of Responsibility).  Moreover, in the absence of a trial, Justice Fisch might not have learned that during the course of the robberies, Mims had pointed his "gun at the head of a three year old child in a stroller while her mother and others looked on in terror."  (S. 19).

34

With that knowledge, after considering Mims' prior record, Justice Fisch concluded that he was a "vicious, violent and manipulative individual" and a "danger to society."  (Id. at 19-20).  In light of those findings, the forty-year sentence that Justice Fisch imposed was warranted.

IV.   Conclusion

For the foregoing reasons, the Court should deny Mims' Petition. Additionally, a certificate of appealability should not be issued because Mims has failed to make the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2).

V.   Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties are hereby directed that if they have any objections to this Report and Recommendation, they must, within fourteen days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Barbara S. Jones, United States District Judge, and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, NY 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Jones.  Any failure to file timely objections will result in a waiver of those objections for

purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 6(a), 6(e), 72(b).

Dated:      New York, New York
            October 3, 2012

                                    _____
                                    FRANK MAAS
                                    United States Magistrate Judge

Copies to:

Honorable Barbara S. Jones
United States District Judge

George Mims
#98-A-2281
Sing Sing Correctional Facility
354 Hunter Street
Ossining, New York 10562

Jean Soo Park, Esq.
Assistant District Attorney
Office of the District Attorney, Bronx County
Fax: (718) 590-6523